1  **RICHARD SCHILKE,**
2  **PAMELA SCHILKE, IN PRO PER**
3

FILED

2019 DEC 30 P 12: 52

U.S. DISTRICT COURT
EASTERN DIST. TENN.

_____ DEPT. CLERK

4  **UNITED STATES DISTRICT COURT**

5  **EASTERN DISTRICT OF TENNESSEE**

6  **AT KNOXVILLE**

| | |
|---|---|
| 7  **BENTON LAWSON** | ) |
| 8  **214 Hughett Rd.** | ) |
| 9  **Huntsville, TN** | ) |
| 10 | ) |
| 11  **RICHARD SCHILKE, Etux.** | ) |
| 12  **PAMELA SCHILKE,** | ) |
| 13  **128 Lawson Rd.** | ) |
| 14  **Huntsville, TN** | ) |
| 15 | ) |
| 16  **ANNETTE LAWSON** | ) |
| 17  **225 Hughett Rd.** | ) |
| 18  **Huntsville, TN** | ) |
| 19              **Plaintiffs,** *Pro Se* | ) |
| 20  **vs.** | )  Civ. Act. No. 3:19cv528 |
| 21 | )  Varlan / Poplin |
| 22  **THE FIRST NATIONAL BANK OF ONEIDA** | ) |
| 23  **250 National Dr.** | ) |
| 24  **Helenwood, TN 37755** | ) |
| 25 | ) |
| 26  **MARK KLINE, PRESIDENT AND CEO OF** | ) |
| 27  **FIRST NATIONAL BANK, in his Official and** | ) |
| 28  **Individual capacity, address unknown** | ) |
| 29 | ) |
| 30  **ALLYN M. LAY, JR., TRUSTEE OF FIRST** | ) |
| 31  **NATIONAL BANK, in his Official and** | ) |
| 32  **Individual capacity,  address unknown** | ) |
| 33 | ) |
| 34  **JAMES L. COTTON, JR., OFFICER OF** | ) |
| 35  **FIRST NATIONAL BANK, in his official and** | ) |
| 36  **individual capacity,** | ) |
| 37 | ) |
| 38  **RHONDA LONGMIRE, FORMER PRESI-** | ) |
| 39  **AND CEO OF THE FIRST NATION BANK** | ) |
| 40  **OF ONEIDA, in her individual capacity,** | ) |
| 41  **address unknown,** | ) |
| 42 | ) |
| 43 | ) |
| 44 | ) |

1

| | |
|---|---|
| 1  AN UNKNOWN NUMBER OF UNKNOWN | ) |
| 2  BOARD OF FIRST DIRECTORS OF FIRST | ) |
| 3  NATIONAL BANK, JOHN DOE, in | ) |
| 4  their individual and official capacity, | ) |
| 5 | ) |
| 6              And | ) |
| 7 | ) |
| 8  WILLIAM H. STOVER, ATTORNEY | ) |
| 9  500 Church St., STE. 450 | ) |
| 10  Nashville, TN 37219 | ) |
| 11 | ) |
| 12              __Defendants.__ | ) |

14                        **COMPLAINT**

15      Plaintiffs Benton Lawson ("Benton"), Annette Lawson ("Annette"), Pamela Schilke

16  ("Pam"), Richard Schilke (collectively "Plaintiffs") for their Complaint for Damages against the

17  Defendant First National Bank of Oneida, their Branches, Agents as Associates in Fact ("FNB" or

18  "Defendant"). That the Plaintiffs acting as Private Attorneys General jointly, severally, or in the

19  alternative with respect to or arising out of the same transaction, occurrence, or series of

20  transactions or occurrences: severally beginning with a forged Deed of Trust dated October 22,

21  1996; a series of nineteen subsequent promise notes between November 1997 through May 6,

22  2002, including the specific transaction on May 6, 2002 ("the May 6th Notes") for "extortionate

23  credit"; an October 10, 2002 short sale and for "money laundering" using the Lawsons collateral

24  property; a second (2nd) series of promise note from October 2002 through April 2009 for "money

25  laundering" as "cash paid to borrower" added into the principal(s) of real property; a forged Trust

26  Deed Modification dated April 21, 2009; and a second (2nd) forged Deed of Trust dated December

27  16, 2009 for the "conversion of property." of the and any question of law or fact common to each

28  that arise in state as follows:

29

## **PARTIES, JURISDICTION, VENUE**

1.     Plaintiff Benton is a natural person residing at 214 Hughett Road, Huntsville TN 37756 located in the Norma Community of Scott County.

2.     Plaintiff Annette is a natural person residing at 225 Hughett Road, Huntsville, TN 37756 located in the Norma Community of Scott County, Tennessee

3.     Plaintiffs Pamela and Richard are natural person residing at 128 Lawson Road, Huntsville TN located in the Norma Community of Scott County.

4.     *Defendant FNB, is a Federal Financial Institution located at 250 National Drive,* Helenwood, TN 37755 (hereinafter "Helenwood Branch") and 18418 Alberta Street, Oneida TN 37841-4699 (hereinafter "Oneida Branch"). FNB is monitored by the Office of the Comptroller of the Currency ("OCC") with a Charter No. 8039, CERT 4958 and RSSD 966731 and insured by the FDIC. The contact for the Helenwood Branch is Attorney JIM TERRY, Senior Credit Analyst.

5.     *Defendants MARK KLINE, ALLYN M. LAY, JAMES L. COTTON JR., jointly* and individually as natural persons residing in Scott County, Tennessee and all are Associates-in-Fact and the RICO Enterprise as Agents of FNB.

6.     Defendant ATTORNEY WILLIAM STOVER address 500 Church St., STE. 450, Nashville, TN 37219 (hereinafter "MR. STOVER") as resident of the State of Tennessee and *situated in the jurisdiction of the 6th District.*

7.     This Court has subject matter jurisdiction over this matter pursuant to Title 28 of the U.S.C. §1331, which provides district courts with jurisdiction over civil actions arising under the laws of the United States, the Racketeer Influenced Corrupt Act (RICO), Title 18 U.S.C. §§ 1961 – 1968. Title 18 U.S.C. §1028 (aggravated identity theft), § 1341 (mail fraud), § 1343 (wire fraud), and § 1344 (financial institution fraud), § 1346 (honest services fraud) and 18 U.S.C.

3

1   3293(2) (regarding the10-year statute of limitations affecting a financial institution), the Real

2   Estate Protection Act, Title 12 U.S.C § 2605 (e) (RESPA) and the Truth in Lending Act (TILA).

3        8.    *This court has personal jurisdiction over the defendant corporation, located in this*

4   district and regulated by Federal Agency, the Office of the Comptroller of the Currency (OCC).

5        9.    Venue is proper pursuant to Title 28 U.S.C. 1391(b) per the events giving rise to

6   this Complaint.

7            **THE RACKEETRING CORRUPT ORGANIZATION ACT (RICO)**

8        10.    *The Racketeering Corrupt Organization Act ("RICO") – 18 U.S.C. §§ 1961, et seq.*

9   – permits private parties who have been injured by a violation of § 1962 of the RICO statute to

10   bring a civil suit in federal court to collect damages, 18 U.S.C. § 1964(c). A civil RICO claim has

11   four element: " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity' "

12   *Moon v. Harrison Piping Supply,* 465F.3d 719, 723 (6th Cir. 2006)(quoting *Sedima, S.P.R.L. v.*

13   *Imrex Co., Inc.,* 473 U.S.479, 496 91985)).

14        11.    A 'pattern of racketeering activity' is defined by statute as requiring at least two

15   acts of racketeering activity as predicate offenses over a ten (10) year period. 18 U.S.C. § 1961(5).

16   The predicate offenses must be "indictable under" a number of federal criminal statutes. 18 U.S.C.

17   § 1961 (1).

18            **THE REAL ESTATE SETTLMENT PROCEDURES ACT**

19        12.    The Real Estate Settlement Procedures Act ("RESPA") – 12 U.S.C. §§ 2601, *et*

20   *seq.* – permits a borrower (or an agent of a borrower) to submit a "qualified written request"

21   requesting an error regarding a "federally related mortgage loan" to be corrected or requesting

22   information relative to such a loan to any servicer of such a loan. 12 U.S.C. § 2605(e)(1).

4

1        13.    RESPA provides that upon receipt of a qualified written request, "a servicer of a

2    federally related mortgage loan…shall provide a written response acknowledging receipt of the

3    *correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless*

4    the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A).

5                       **Statement of Facts**

6        14.    FNB is a mortgage "servicer" as defined by 12 C.F.R. § 1024.2(b) and 12 U.S.C. §

7    2605(i)(2). FNB is the current servicer of Plaintiffs' and Class Members' notes and trust deeds on

8    *real property that secure those notes (collectively referred to hereinafter as the "Loans").*

9        15.    The Loans are each a "federally related mortgage loan" as defined by RESPA and

10    Regulation X. 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

11        16.    Benton submitted two letters (2) in March and April of 2019 requesting information

12    from regarding the servicing of the Loans, to which FNB failed to respond. Benton also requested

13    *the formal release of the two (2) trust deeds: first, dated October 1, 1985 and second,*

14    January 18, 1988 per Tennessee Code Annotated 66-25-101 which states that a formal trust deed

15    release be in writing and delivered certified mail. This release was addressed directly to Mark

16    Kline and delivered certified mail on or about April 21, 2019 to which Mark Kline called Benton

17    on or about April 24, 2019 regarding the recent request(s), [SIC] 'I can't do that!' and hung up.

18    *Mark Kline told Benton to get the information at the Registers Office.*

19        17.    Upon careful review of the record, Benton and Richard discovered the property

20    description(s) listed on the trust deeds to be incorrect and drafted a Quitclaim Deed and Affidavit

21    of Heirship (hereinafter "Affidavit") to correct the record.

22        18.    The Quitclaim Deed and Affidavit are filed in the Register of Deeds Office, Scott

23    *County, Tennessee (as all records mentioned in this Complaint). More specifically, the Quitclaim*

5

1  Deed in Record Book 13, at page 588 on November 27, 2019 at 10:38 a.m. and incorporated by

2  reference, the Affidavit, filed in Record Book 13, at page 416. Plaintiffs also corrected the record

3  at the Tax Assessor's Office on December 12, 2019 to provide "actual notice."

**FACTS RELEVANT TO 225 HUGHETT ROAD**

5  19.    The following facts are based upon information as found in the record at the

6  Registers Office.

7  20.    The real property is located at the common address of 225 Hughett Rd. (hereinafter

8  "Property A") as referenced above [para. 2], Map No. 124, Parcel 9.01 and is a sublot of

9  214 Hughett Rd. Map No. 124, Parcel 9.00 [para. 1] (hereinafter "Granny's house"). Parcel 9.00,

10  Granny's house is most properly described as **'the same property conveyed to Autha Mae**

11  **Lawson** (hereinafter "Granny") **by the will of Mitchell Lawson...'**

12  21.    Wilma Kidd (aka Wilma Jeffers hereinafter "Wilma") purchased 225 Hughett Rd

13  as 2/3rd acre lot on August 21, 1979 transaction between Autha Mae Lawson (hereinafter

14  "Granny") and daughter Wilma, [WD Book 154, at page 681]. Wilma took a loan from FNB Loan

15  Officer, Jenny Goad, on October 20, 1979 for $18,000 to build a house [TD Book 88, page 159].

16  The property description(s) are **incorrect** fail to acknowledge the conveyance from Granny to

17  Wilma, the actual words '**[b]eing the same property conveyed to Autha Mae Lawson by the**

18  **Will of Mitchell Lawson...**' or Granny's house. The transaction was **not** listed for the "actual

19  notice" of the record at the Office of the Tax Assessor until Benton recent Quitclaim Deed [18].

20  22.    Property A or 225 Hughett Rd., was sold to Benton (Wilma's brother) and Annette,

21  as a married couple on October 1, 1985 for $20,000 [WD Book 173, at page 374 (drafted by

22  Defendant James L. Cotton Jr.)] and a loan was taken by Benton and Annette from FNB Loan

23  Officer Jenny Goad,  $25,000 [TD Book 104, at page 721]. The property description(s) in both

6

1  documents are incorrect, failing once again to acknowledge the transaction from Wilma to Benton

2  and Annette,  described as '**[b]eing the same property conveyed to Autha Mae Lawson by the**

3  **will of Mitchell Lawson...** ' *Benton was recovering in the hospital as both lungs collapsed causing*

4  *total disability* (to show Benton's "condition of mind" at time of transaction). Benton, Annette and

5  Wilma recall the amount of the loan amount $20,000, not the $25,000 listed on the trust deed. The

6  trust deed is opened-ended with no maturity date listed. Benton requested the QWR promise note

7  and formal release in March/April 2019 letters to FNB Defendant Mark Kline.

8      23.     *The record reflects a second (2nd) trust deed for the amount $3,000 dated*

9  *January 18, 1988* [*TD Book* 111, at *page* 753] which also incorrectly references the property

10  description as '**[b]eing the same property conveyed to Autha Mae Lawson by the will of**

11  **Mitchell Lawson...** ' (Granny's house). Neither Benton or Annette recall this loan and the trust

12  deed is open-ended with no maturity date listed. Benton received Social Security Disability

13  *backpay and had no need for a loan. Benton requested the promise note and payment history for*

14  *this loan in the March 2019 QWR to the Defendant FNB Mark Kline.*

15      24.     The principal increased from the outset of the loan. Jenny Goad, Loan Officer

16  explained the increase as interest caused by the Adjustable Rate Mortgage (ARM). Pamela recalled

17  several discussions between Annette and Wilma regarding the fact they couldn't 'pay down the

18  loan.'

19      25.     Benton and Annette Lawson were divorced in 1994 [Annette Lawson vs. Benton

20  Lawson (Scott County Cir. Ct. case 3977) (vesting Benton title to PROPERTY A 225 Hughett

21  Road)] the property description corrected in the December 16, 2009 deed of trust [*Derivation of*

22  *Title, Trust Book* 257/474]. For their "condition of mind" the divorce was BITTER, with Annette

23  moving to Pennsylvania to live with her sister, leaving behind her two (2) sons, Aaron and Mitchel.

1    26.    Benton was contacted by FNB Loan Officer Jenny Goad to cosign for

2    128 Lawson Road (hereinafter "Graham house, Graham debt and/ or Graham loans" and "Property

3    B or Shadow Property). *The Graham Promise Note was February 4, 1997. A $50,000 trust deed*

4    *was filed on February 12, 1997 [Trust Book 144/687] and used as "collateral" on the Graham debt.*

5    *The $50k TD lists Benton and Annette as "joint tenants" and dated October 22, 1996. Annette was*

6    *living in Yardley, PA and bank statements show her making a purchase at Rite Aid October 22,*

7    *1996. The signature page dates Annette's signature as November 4, 1996. The property description*

8    *incorrectly lists the $3,000 TD as a "warranty deed" for reference.*

9    27.    FNB created a Trust Deed Modification for the $50k TD in April 2009 to extend

10   the 15-year maturity date to October 2029. The date of signing is the same day as Granny's funeral.

11   Granny is Benton's mother… (for the "condition of mind)." The TD modification is referenced in

12   the margin (hidden) of the $50k TD and was discovered by Richard and Pamela in an extensive

13   *title examination. There are four (4) trust deeds currently recorded by Defendant THE FIRST*

14   NATIONAL BANK OF ONEIDA and Defendant ALLYN M. LAY, JR., Trustee: 10/1/1985 for

15   $25,000 [*Trust Book* 173/374]; 1/18/1988 for $3,000 [*TD Book* 111/753]; 10/22/1996 for $50,000

16   [*Trust Book 144/687*]; 12/16/2009 for $55,706 [*TD Book 257/474*] all are listed on the March 2019

17   QWR sent to Defendant Mark Kline of FNB.

18                              **<u>FACTS RELEVANT TO 128 LAWSON RD</u>**

19   28.    Richard and Pamela purchased as "unsophisticated first-time homebuyers" in April

20   2009 128 Lawson Rd. aka Property B from Annette [*WD Book* 268, *page* 715] for $95,104.

21   Defendant James L. Cotton is the draftsman of the General Warranty Deed and contemporaneous

22   "Title Opinion" and subsequently misrepresented the property address as 3521 Norma Road. This

23   *misrepresentation is the beginning of "golden thread" wound through the Register's Office*

1     culminating in this Complaint. Upon retrieval of the Tennessee Real Appraisal Card from the Tax

2     Assessor's Office for 128 Lawson Rd, Richard and Pamela notice the sales information in the

3     *lower left corner which record the sale date, actual notice of the deed, and sales price.*

4     29.     The previous sale of lists the date of 10/10/2002 in WD Book 239, at page 640.

5     This is the Trustees' Deed of Defendant Allyn M. Lay, which on its face tells the world that the

6     property was part of a foreclosure on the previous owner(s) Billy Ray Graham, etux. Susie Graham.

7     The Trustees' Deed lists the original Graham debt ($32,817.87), the lien-holder FNB of Oneida,

8     *and actual notice of the Deed of Trust found in Trust Deed Book 144, at page 742 (neglecting to*

9     show the amount 'For Tax Purposes' inflated to $35,000). The Trustee's Deed list the subsequent

10     seven (7) renewals of this loan from February 4, 1997 through May 6, 2002. The May 6, 2002

11     (hereinafter "The May 6th Notes" lists two (2) in the amount(s): $28,259.28 (May 8th, 2002) and

12     $28,279.29 (May 6, 2002). [*Complaint* ¶ 30]. The Trustee's Deed also lists nine-teen (19)

13     *subsequent notes from November 1997through May 6th, 2002 [Complaint ¶ 30]. The Trustee's*

14     Deed mentions the 'for sale at foreclosure' price as the highest bid, (Annette's), $55,480.00. This

15     amount was discussed at a meeting prior to the short-sale between Annette, and Allyn Lay.

16     30.     The Grahams Warranty Deed [*TD Book* 214, page 219] lists the sale date of January

17     17, 1997 for $18,000 and an Affidavit of Heirship (both instruments prepared by Defendant James

18     L. Cotton Jr. for his "condition of mind" regarding the properties mention herein). The Warranty

19     Deed misrepresents the property address as 4245 Norma Rd.

20     **FACTS RELEVANT TO PLAINTIFFS**

21     31.     Plaintiff PAMELA SCHILKE (individually) is the oldest daughter of BENTON

22     and ANNETTE LAWSON and the primary Agent of two (2) <u>Special Power of Attorney</u> of

23     ANNETTE and BENTON LAWSON [*See Record, Misc. Book 174/707&174/709*] for the purpose

9

of investigating the allegations stated herein and most recently named as a Beneficiary to the Remainder Interest of a Quit Claim Deed for Life Estate from Benton Lawson to Annette Lawson *filed in the Register of Deeds located in Scott County on November 27, 2019 at 10:38 a.m.*

32.     BENTON is paternal kin to PAMELA SCHILKE, AARON LAWSON, Michelle Morrow, and Mitchell Lawson (hereinafter "KIDS") all of whom are Beneficiary to the Remainder Interest of the Quit Claim Deed (id.) and as "heirs and assigns" subsequently responsible for the trust deeds mentioned herein. BENTON requested information regarding the servicing of his loan(s) beginning March 2019 *and subsequently, the release of two (2) open-end trust deeds dated* October 1985 and January 1988, which incorrectly describe the property conveyed. And Benton, for a Quitclaim Deed (To Convey Life Estate, Reserve Remainder Interest and Correct the Record with a contemporaneous Affidavit of Heirship filed in the Register of Deeds on November 27, 2019 and

33.     *Annette is owner of PROPERTY B since a foreclosure sale October 10, 2002 when* Defendant THE FIRST NATIONAL BANK OF ONEIDA and Defendant ALLYN M. LAY, JR. Trustee of FNB forced ANNETTE to "purchase" the "GRAHAM debt" or forfeit Property A using the October 26, 1996 ($50,000) Trust Deed as collateral as listed on the "May 6th Notes." The May 6 Notes display Annette and Benton as Borrowers bringing nature of the foreclosure sale into *question legally regarding the resale of the debt to Annette. The May 6 notes contain forged,* clearly altered signatures of Annette and Benton Lawson.

34.     Wilma Jeffers is a resident of Scott County, Tennessee with a home address of 169 Rocky Lane, Huntsville TN, the titled owner of 214 Hughett Rd. which is the subject of the incorrect property description necessitating the Affidavit [id. para. 9] and necessary party to this Complaint

## **FACTS RELEVENT TO DEFENDANTS**

35.     Mr. Terry managed the reply to Plaintiffs OCC complaint regarding a $40,333 charge-off placed on Equifax Credit Report. *The Defendant FNB is the lienholder of the Notes for* Property A & B.

36.     Defendant MARK KLINE is President and CEO of THE FIRST NATIONAL BANK OF ONEIDA BRANCH, located at 18418 Alberta Street (P.O. BOX 4699), Oneida TN 37841 MR. KLINE is the specific person to which the March 2019 QWR [*See QWR*] is addressed *due to his personal involvement of several of the events listed herein and most recently, maker of* a personal phone call to Benton on, or about April 24, 2019 regarding the "debt." MR. KLINE did attempt to use the proceeds ($10,000) in a 2012 insurable casualty of Property "B" to pay on the $40,333 "charge-off." Furthermore, Mr. Kline is the addressee of a Formal Trust Deed Release written request in January 2013 regarding the "charge-off."

37.     Defendant ALLYN M. LAY, JR *as Vice President and Trustee of FNB*, with the postal address of P.O. 4699, Oneida, TN 37841-4699 (hereinafter "MR. LAY") currently listed as Trustee on the Trust Deeds as listed, and most prevalently a <u>Trustee's Deed</u> listing nineteen (19) subsequent "nominee" loans, and more specifically three (3) separate Promise Notes dated May 6, 2002 (hereinafter "MAY 6th NOTES") used to induce Annette into the purchase of the fraudulent "*Graham debt*" *at the October 10, 2002 short-sale. The May 6th Notes are misrepresented on the* Trustee's Deed as $28,259.28 dated May 8, 2002 and $28,279.29 dated May 6, 2002, the second being a renewal of the first. These May 6th notes are key to this proceeding as they list Benton and Annette Lawson and the $50,000 TD as collateral just three (3) month before the short sale listed above, for the conversion of property.

11

38.     Defendant JAMES L. COTTON, JR., as an Officer of the Board of Directors of FNB since 1992 and the Attorney-of-Record regarding the three (3) properties mentioned herein, _Preliminary Title Opinion_ April 14, 2009, _Final Opinion_ May 6, 2009. _Defendant_ COTTON negligently represented the following: Property B 128 Lawson Rd. as '4245 Norma Rd' [_GRAHAM Deed_] and '3521 Norma Rd' [_SCHILKE Deed_] and the property description on WD of Property A (225 Hughet Rd.) using the same description the main property 214 Hughett Rd which is the subject of the Affidavit [id. para.9].

39.     Defendant RHONDA LONGMIRE (hereinafter "MS. LONGMIRE") _is a loan officer in Lafollette, Tennessee address currently unknown._ MS. LONGMIRE'S culpability is relative specifically to the December 14, 2009 arms-length meeting between the Plaintiffs Schilkes and Lawsons and the Defendants FNB, to which MS. Longmire as Agent of FNB in her official capacity as President and CEO of FNB did facilitate: SCHILKES Warranty Deed-in-Lieu-of-Foreclosure [_Deed Book 271/678_] and ANNETTE'S Special Warranty Deed [_Deed Book 271/681_]; for the improper delivery of deed to PROPERTY B (filed without Annette's signature) and two (2) trust conveyances: Property B as $55,718.73 [_Trust Book 257/ 469_] and Property A as $55,706.71 [_Trust Book 257/ 474_]..

40.     Defendant ATTORNEY WILLIAM H. STOVER. Mr. Stover was retained July 2009 ($500) _to retrieve the closing documents of PROPERTY B. Plaintiffs sent MR. STOVER all the promise note(s) provided by Ms. Longmire,_ then neglected to return all correspondence from n April 29, 2010 letter Request for Information from Defendant FNB. Defendant MR. STOVER only responded when Plaintiff RICHARD SCHILKE listed him as legal counsel on the OCC Complaint (regarding the "charge-off") to which MR. STOVER denied ever knowing the Plaintiffs.

## Alternative Remedies

41.     Plaintiffs sought the alternative remedies of the Office of the Comptroller of the Currency, Federal Trade Commission, FDIC, TN *Attorney General's Office*, Senator Corker's Office, FBI and U.S. Attorney's Office, all concurred that Plaintiffs were victims of Identity Theft.

## ALLEGATIONS REGARDING RICO PATTERN, CONDUCT, ENTERPRISE

42..     The Plaintiffs allege on or about April 2009 Plaintiffs SCHILKES applied for a loan from Defendant FNB for Property B, and that their Agent Loan Officer Brenda West, to which FNB approved and scheduled the closing date for April 21, 2009 in the amount of $96K(approximate) and that the date as notarized *April 21, 2009* is "ante-dated" due to the funeral of Benton's mother Autha Mae Lawson on that day [*See Exhibits*].

43.     That Plaintiffs allege that they collectively received none of the "customary" Truth in Lending Act (TILA) closing documents due to the FNB use incorrect address 3521 Norma Rd., and Annette was *not present at the time of closing and her signature was needed.  Annette signed two days later.*

44.     Plaintiffs allege that the SCHILKES discovered the apparent scrivener's error address of "3521 Norma Road" in May 2009 when FNB Brenda West telephoned to inform "128 Lawson Road" was incorrectly listed on the provided indemnity policy [*See Warranty Deed 268/715*].

45.     Plaintiffs allege that the Schilkes retained Attorney Stover to retrieve the April 21, 2009 closing documents, at which time Richard noticed a "Consumer Security Agreement" listing three (3) trust deeds for Property A and the Schilkes as co-obligees [*See Exhibits*].

## The Artifice in the Abstract of Property A

13

46.     The Plaintiffs allege a pattern to defraud the equity evident from the outset of October 1, 1985 when the Defendants FNB "inflated" the $20,000 purchase price to $25,000 on a Deed of Trust [*See TD 10/1/85*].

47.     The Plaintiffs allege that a second (2nd) Trust Deed for $3,000 ("1/18/88") and the amount "added" into the principal without the knowledge of the Lawsons.

48.     The Plaintiffs allege that the Property "A" original loan (10/1/85) was renewed on an annual basis eliminating the principal equity and that the principal balance began "growing" even though the payments were never late, over the entirety of the loan.

49.     The Plaintiffs allege that these fraudulent lending practices led the "bitter" divorce Benton and Annette in November1994 as filed.

50.     The Plaintiffs allege that Annette Lawson moved to Yardley, Pennsylvania shortly after the divorce and closed her account(s) at FNB. And that Annette did NOT return to Scott County, TN to enter into a transaction to receive money from the October 22, 1996 Trust Deed, which clearly has forged signatures of Annette. The notary, Virginia Goad (Jenny), notarized the Trust Deed October 22, 1996, acknowledged witnessing their signatures on that day. The notarized acknowledgement alone makes this deed a forgery as a matter of law. Annette was not in Tennessee at the time the deed was created and notarized and was not in Tennessee to sign a $50,000 promissory note referenced in the October 22, 1996 deed.

51.     The Plaintiffs allege that on about February 4, 1997 the FNB loan officer(s) devised a scheme utilizing using the Property B as a "shadow property", the Grahams as "straw borrows" and their personal information to create "phantom accounts" (escrow or "suspense accounts") and facilitate nineteen (19) Nominee Loans [*See Trustee's Deed*] as follows: 11/18/97 ($567),

14

1    1/23/1998 ($3,281), 4/27/1998 ($4,668 with $1,000 added), 8/27/1998 ($6,489 with $1,321 added

2    and $500 'cash'), 10/25/1999 ($1,157 "cash" list TD 10/22/96), 12/23/1999 ($1,000 "cash"),

3    1/18/2000 ($4,889 renewal 8/27/99 with $1,000 "cash"), 3/7/2000 ($3,238 renew 10/25/99 and

4    12/23/99 with $1,500 "cash"), 5/23/2000 ($9,499 renewal of 1/18/00 and 3/7/00 with

5    $1,400 "cash" added), 7/3/200 ($13,943 renew 5/23/00 with $4,500 "cash" added),

6    9/1/2000 ($1,039 "cash"), 11/3/2000 ($1,434 with $700 "cash" added), 11/27/2000 ($16,062

7    renew 7/3/00 and 9/1/00 with $670 "cash"), 3/12/2001 ($16,415 renew 11/27/00 with $700

8    "cash"), 4/25/2001 ($17,427 renew  3/12/01 with $1,000 "cash") 6/4/2001 ($1,089 "cash"),

9    6/22/2001 ($24,660 renew 4/5/01 and 6/4/01 with $6,180  "cash") and 2/1/2002 ($24,401 renew

10   6/22/00). This pattern is described in several FFIEC (Federal Financial Institutions Examination

11   Council) White Manuals regarding Insider Fraud.

12   52.    The Plaintiffs allege the October 26, 1996 ("10/26/96" $50K) Trust Deed was used

13   to further the scheme, that after February 4, 1997 [*See Exhibits GRAHAM transactions*] the Loan

14   Officer Virginia Goad, did "ante-date" the document and file in the registers office on February

15   12, 1997, two (2) days before filing the GRAHAM Warranty and Trust Deed(s) $35K 2/4/97 [*See

16   Record at Deed Book 214/219, Trust Book 144/172*]. Furthermore, FNB Agents perpetrated a

17   "fraud in the execution" 'surreptitious substitution of documents' to gain signatures by presenting

18   only the signature page and attaching the face of the document after the transaction, including the

19   subsequent Trust Deed Modification 4/21/2009 and Trust Deed 12/16/2009.

20   53.    The Plaintiffs allege that FNB Virginia Goad used the Lawsons, the Grahams

21   personal information to report to the Credit Bureaus the multiple loans to legitimize the debt.

22   54.    The Plaintiffs allege the Defendant's used, for the Conversion of Property, the

23   three (3) "May 6th Notes" to move the money into Benton's and Annette's' "responsibility,"

making it appear that the Lawsons were "co-borrowing" and "approving" the "Graham subsequent loans" using the October 26, 1996 Trust Deed [*See Exhibits*].  The first May 6th as it listed on the *Trustee's Deed is for $28,259 (with an incorrect date of May 8th), and as it appears on the actual Promise Note with a legible loan number as 3475639 renewal of 3473014 dated May 6th, 2002;* the second May 6th Note ($28,279) as listed on the Trustee's Deed purports to convey the two (2) notes as a successive renewal, whereas the actual Promise Note shows the loan number 3475647 ( scribbled out and handwritten as 3476439) and the renewal number 3473022 (scribbled out and *penciled in as 3475639). Additionally, a third (3rd) subsequent promise note listed on the Trustee's Deed for $24,970 dated (May 6th, 2002 and as it appears on a promise note with the loan number* 3475647 renewal of 3473022 and 3473022[id para. 29 at line 17] as it appears on the Trustee's Deed dated February 1, 2002 also on a promise note as a successive renewal of the June 22, 2001 promise note that adds $6,180 as "cash to borrower." The February 1st, 2002 note effectively *"washes" $6,180 from the direct view of any auditor.*

55.    The Plaintiffs allege that the foreclosure sale of 10/10/2002 was held to extort Annette into "legally" assuming all the "Graham" debt, an unknown amount due to "confidentiality".

56.    The Plaintiffs allege that the original $32K GRAHAM debt was added back into the both properties a second (2nd) time as 'cash paid directly to borrower': $16, 901.11 Property "A" (Benton & Annette) and $16,631.01 Property "B" (Annette & Benton). Property B sold for $55,000 and FNB added the $32,000 Graham Debt back into the principal: Benton and Annette Lawson 225 Hughett Rd.  Property A raising the principal to $73,929; Annette and Benton Lawson 225 Hughett Road Property B raising the principal to $87,357 [*See Exhibits: Promise Note.*]

16

57.     The Plaintiffs allege The FNB Defendants collected from a September 2003 insurable casualty fire was with a total payout, including personal items for $87,000 [*Exhibits Allstate*].

58.     The Plaintiffs allege that and additional $16,126 'Cash paid to Borrower' was added into Aaron Lawson's May 13, 2003 Auto Loan (Customer #1887 *Promise Notes, Loan #3523909*) and subsequently renewed and added into the principal of Property B where he resided at the time raising the principal to $97,669 (refinance #3523909) August 31, 2005.

59.     The Plaintiffs allege that the Artifice continued through Property A: purchase of a 1992 Ford truck loan Amount - $4,133 @ $253/mo. for 18/mo. Benton paid the principal balance down to $703 when FNB, loan officer Jenny Goad, added $2,500 'cash to borrower'(which he did NOT receive) on May 10, 2005 and subsequently adding $3,000 to Property A principal balance $75,574 also on August 31, 2005.

60.     The Plaintiffs allege that Trust Deed Modification the TD 10/26/1996 dated April 21, 2009 was "signed" without the knowledge of Benton and Annette as the Lawsons were for the Schilkes closing of Property B.

61.     The Plaintiffs allege After the Schilkes joined with the Benton and Annette to retain Mr. Stover in November 2009 for $2,500 to file a lawsuit.

62.     The Plaintiffs allege that December 2009 FNB Agent Rhonda Longmire and the "Board" offered to release the Schilkes from the "debt" if they would sign a Deed in Lieu of Foreclosure. Furthermore, FNB offered to the *reduce the sale (resale) by $40,333 if the Schilkes agreed not to sue,* creating two (2) "separate" trust deeds ($55,718 and $55,706) mentioned herein for the purpose of moving the $40,333 charge-off from Property "B" to Property "A" facilitating

1    the Benton's March 2019 RESPA QWR for Information pertaining to the servicing of the loan and

2    any payment applied toward the charge-off.

3           63.    The Plaintiffs allege that the incorrect property description on the TD's 10/1/85 and

4    1/18/88 was recently discovered upon thoroughly review of all the documents from Property A

5    abstract of title for the RESPA written request in March 2019.

6           64.    The Plaintiffs allege that Ms. Longmire agreed to "look into" the October 10, 2002

7    amounts ($32k) and but never responded to the Plaintiffs after the December 14th meeting.

8           65.    The Plaintiffs allege that after December 14, 2009 Benton's loan payment increased

9    to over $500 per month and is currently increasing every year.

10         66.    The Plaintiffs allege that on or about February 26, 2010 the Defendants FNB and

11    their Agent Ursula Sexton did use the U.S. Postal Service to send Benton a letter informing that

12    Penn National indemnity provider was "cancelling" his policy and that Benton needed to return

13    the form provided with his notarized signature, making it appear that he was requesting the policy

14    to be cancelled. Plaintiff Richard Schilke did assist Benton in communicating directly with Penn

15    National to discover that his policy was NOT cancelled, and that Richard did pay, on a monthly

16    basis, Benton's policy through an Automated Funds Transfer.

17         67.    The Plaintiffs allege that the February 26th was initiated by FNB to sell him another

18    insurance policy which Ursula Sexton First Insured, subsidiary of Defendant FNB, conveniently

19    offered to sell Benton, and that the monthly policy amount more than doubled.

20         68.    The Plaintiffs allege Richard informed Defendant MR. Stover March 2010 Benton

21    desired to pursue lawsuit against FNB and Mr. Stover's last "willing" correspondence with

Plaintiffs was an April 29, 2010 submittal letter regarding a Request for Production of Document to Defendant FNB [*See Exhibit Letter*].

69.    The Plaintiffs allege on January 22, 2010, Richard and Pamela signed a <u>Lease Option Purchase Agreement</u> with Annette Lawson for the 128 Lawson Rd. (Property B) to maintain indemnity policy in Schilke name, Pamela lost everything in November 2003 house fire and FNB demanded entire $87,000 to go towards the "debt" an amount of $40,000 for contents was taken upon receipt by FNB and had a direct effect on her and her children.

70.    The Plaintiff allege an *insurable casualty July 5, 2012 (washer overflowed)*. The Defendant Mark Kline stated the $6,613 indemnity check would go towards $40,333 charge-off breaching the December 2009 agreement to "assume the debt."  The Schilkes discovered the charge-off reported on each of their credit reports, a clear breach of agreement between the parties.

71.    The Plaintiffs allege a return to Register of Deeds in July 2012 and discovery of the *April 21, 2009 Trust Deed needed to be "formally released" and two (2) separate trust deeds (separate amounts $55,718 and $55,706 "for tax purpose")*.

72.    The Plaintiffs allege research and discovery of the Tennessee law regarding Formal Trust Deed release be in writing, so Richard accordingly submitted a letter to Mark Kline in January 2013 and FNB "formally" released the debt.

73.    The Plaintiffs allege that they received no "actual notice" of any of the Trust Deeds mentioned herein, that the Defendants did fraudulently conceal the transactions in the Register's Office using the 'doctrine of constructive notice by mere presumption of law, arising from the operation of the registry acts,' and should ' be taken with certain qualifications' that 'bind the conscience' to the fact that "actual notice" is cognizable.

19

74. The Plaintiffs allege that the Defendants did further fraudulently conceal the proceeds from these misappropriation of funds in the archives of FNB and failed to provide the CFPB § 1026.41 "*Periodic Statement*" *showing the particulars of payment disbursement for* mortgage loans and "Disclosure requirements for open-end consumer credit plan secured by consumer's principle dwelling as required by 15 USC § 1637a.

## CAUSES OF ACTION

### COUNT I
### RICO §1962(c)

75. Paragraphs 1 through 74 are re-alleged and incorporated by reference herein.

76. Count I is against Defendants MARK KLINE, ALLYN LAY, RHONDA LONGMIRE and THE BOARD OF DIRECTORS OF FNB ("Count I Defendants") individually and collectively all are associated-in-fact.

77. The Count I Defendants as Agents of the Defendant FNB as an enterprise engaged in and whose activities affect interstate commerce using the interstate mail and wire for the purpose of reporting consumer debt to the major credit bureaus.

78. The Count I Defendants agreed to and did conduct and participate in the enterprise *through a pattern of racketeering activity for the purpose of intentionally defrauding the equity of* Property A and Property B, and used the Plaintiffs identity pursuant to Title 18 U.S.C. §1028 (aggravated identity theft), **a subsection of 18 U.S.C. § 1961(1), which** § 1028(a)(1) and (c)(1) **states,**

> **Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses without lawful authority, a means of identification of another person shall, in addition to a term of imprisonment of 2**

**years... section 656 (relating to theft, embezzlement, or misapplication by bank officer or employee).**

**More specifically** by using the personal information of the Plaintiffs to report $40,333.00 after the December 31, 2019 to the major credit bureaus as a charge-off to legitimatize debt from transactions that the FNB defendants knew to be fraudulent in nature.

79.     That on or about December 31, 2009 RHOHNDA LONGMIRE did knowingly report the $40,333 as a charge-off in violation of Title 18 U.S.C. § 1343 (wire fraud) as she personally offered the Plaintiffs the specific amount to deter an impending lawsuit, and Ms. Longmire as a Certified Public Accountant (CPA) had the superior training to clearly see the fraud described in the Trustee's Deed and Graham Debt, and failed to inform the proper authorities.

80.     The Count I defendants used two (2) trust deeds, the amounts of $55,718 and $55,706 to look identical on their face and disguise one trust deed used for the conversion of $40,333 of fraudulent debt from 128 Lawson Rd, Property B over to Property A, 225 Hughett Rd and recorded December 31, 2009 in violation of Title 18 U.S.C. § 1956 (Money Laundering) which states,

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

> (B) knowing that the transaction is designed in whole or in part--

> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;

81.     The Count I Defendant JAMES L. COTTON JR. position on the Board of Directors in violation Title 18 U.S.C. § 1346 "honest services fraud" and 'includes a scheme or artifice to deprive another of the intangible right of honest services.' That the Defendant is the attorney of record as a competent real estate attorney in the following transactions: October 1, 1985 General

21

Warranty Deed for 225 Hughett Rd.; September 6, 1992 General Warranty Deed for 214 Hughett Rd. and subsequent Deed to Convey Life Estate December 1,1992; and for Property B, **1)** General Warranty Deed *January 17, 1997 and subsequent Affidavit of Heirship, and* **2)** *a General Warranty* Deed dated April 21, 2009 and Title Opinion. That the following misrepresentations have paved the way to conceal the fraud: **1)** the incorrect property description and chain-of-title in the October 1, 1985 General Warranty Deed for Property A and **2)** the property addresses for Property B as 4245 Norma Rd. in the General Warranty Deed dated January 17, 1997.

82.   That the Defendant ALLYN LAY witnessed the 19 subsequent notes, especially the MAY 6th Notes, and falsely or fraudulently misrepresent the notes in the Trustee's Deed, as to the nature of the transactions and the fact that the Lawsons were listed as the actual "borrowers" of the debt three (3) months before foreclosure short-sale and reselling the property back to them.

83.   That on or about February 13, 2010 Ursula Sexton, First Insured subsidiary of FNB did use the mail and send to BENTON LAWSON a fraudulent cancellation notice in violation Title 18 U.S.C. § 1341 (mail fraud) and § 1513 (retaliating against a victim). Since Ms. Sexton was not party to the December 16th arms-length meeting, she would have pertinent information who instructed her to cancel Benton's policy.

84.   In furtherance of the fraudulent scheme the Count I Defendant MARK KLINE did attempt to use the SCHILKES proceeds from an insurable casualty to Property B to cover the charge-off against the SCHILKE rather than restore the casualty and that MARK KLINE did decline in an April 2019 telephone conversation with Plaintiff BENTON LAWSON to provide the requested payment history saying, 'I can't do that' [sic].

*Predicate Acts (2 or more)*

85.     Pursuant to and in furtherance of the fraudulent acts pertaining to the alleged RICO violations (according to the Title 18 USC § 1961 (1) *"racketeering activity" means* (B) *any act which is indictable under any of the following provisions of title 18, United States Code* (D) the Count I Defendants, collected the Plaintiffs personal information as described in Title 18 USC 1028 (Identification Fraud):

> (a)(7) *knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law; or*

> (b)(1)(D) *an offense under paragraph (7) of such subsection that involves the transfer, possession, or use of 1 or more means of identification if, as a result of the offense, any individual committing the offense obtains anything of value aggregating **$1,000 or more** during any 1-year period[.]*

Title 18 USC 1956 (Money Laundering)

> (a)(1) *Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—*

> (B) *knowing that the transaction is designed in whole or in part--*

> (i) *to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;*

86.     The collective Count I Defendants did transfer the SCHILKE and the LAWSONS personal information (names, social security numbers, addresses) using the Equifax, Experian and Trans Union "Credit Bureaus" with the intent of legitimizing the debt as a "charge-off" in the amount of $40,333 in violation of section 1341 and 1343 (*mail and wire fraud*) and section 1344 (*financial institution fraud*). "Each use of the mail and wire constitutes a separate violation even if there is one scheme to defraud". *U.S. v Joyce*, 499 F.2d 9,18.

**Pattern (Open-Ended)**

23

87.     The Defendants FNB allegedly created a false trust deed conveyance (October 26, 1996 $50K) in conjunction with the GRAHAM purchase (February 4, 1997) and used the deed of trust as collateral for the GRAHAM debt (19-subsequent loans to the GRAHAMS including the May 6th Notes) and reported each loan as alleged herein to the Credit Bureaus to "legitimize" the debt. In furtherance of the scheme, the Defendant FNB incrementally moved the alleged GRAHAM debt into the LAWSON accounts over the same time period.   In April 2009 the Defendants FNB attached the encumbrances to a Consumer Security Agreement (signed by the SCHILKES). Finally, the Defendants FNB attempted to "complete" the scheme using a $40,333 "charge-off" and creating two (2) Deeds of Trust on December 16, 2009 which Jim Terry, Senior Credit Analyst for Defendant FNB admitted 'separate deeds indicate separate loans' [sic] in a telephone conversation with the Plaintiff RICHARD SCHILKE on September 29, 2017 (regarding the SCHILKES Bankruptcy "lookback" on Property B). This series of actions indicates a 'regular way of conducting business.' *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 242 (1989) by the Defendant FNB.

88.     The Plaintiffs did suffer injury to Property A and Property B as a direct and proximate cause of the RICO violation(s) when the principal debt increased from $20,000 to $75,000 (Property A) and $18,000 increased to $97,000 (Property B). Proximate cause is shown when the "wrongful conduct [is] the substantial and foreseeable cause." *Trollinger v. Tyson Foods Inc.*, 370 F.3d 602, 615 (6th Cir. 1987) and the relationship between the wrongful conduct and the injury is "logical and not speculative." *Grantham & Mann, Inc. v. American Safety Prod., Inc.*, 831 F.2d 596, 606 (6th Cir. 1987). The SCHILKE can show from the documents provided in the LONGMIRE "arms-length" meeting that the allegations are logical and not speculative or vague and conclusory, but concrete beyond a reasonable doubt.

24

**COUNT II**

<u>**RICO § 1962(a)**</u>

89.     Paragraphs 1 through 87 are re-alleged and incorporated by reference herein.

90.     Count II is against Defendants FNB and the collective Count I Defendants, ("Count II Defendants").

91.     The Count II Defendants used, and invested, income derived from a pattern of racketeering activity in an interstate enterprise to strip the equity in both Properties and *misappropriate the funds. The Count II Defendants concealed the amount of $40,333 as a* "charge-off" of which they can claim the benefit of a tax consequence or collection of "reinsurance" regarding the foreclosure sale(s) as the Property B foreclosed twice (2) and "re-sold" to the Plaintiff ANNETTE LAWSON and the Defendant FNB used the disparity to collect the payout of the insurable casualty 2003 fire toward the Plaintiffs personal items.

92.     Plaintiffs were injured directly and proximately by the Defendant cause by being forced to the relinquish the recovery from insurable casualty on PROPERTY B in 2003 as it relates to the personal items lost in the fire as FNB dictated the entire  amount be applied to the disparity caused by the Artifice mentioned herein.

93.     Plaintiffs were injured by the Defendants adding the misappropriation of funds back into the principal as "cash paid borrower" over the years, including the $3,000 amount secured by the trust conveyance 1/18/1988 as it was a loan paid on separately from the original home loan for Property A, yet to amount of $3,000 (or thereabout at the interest rate is reverse engineered) is repeatedly added to the principal over the entirety of the loan.

                              **COUNT III**

94.     Paragraphs 1 through 92 are re-alleged and incorporated by reference herein.

95.     Count III is against the collective Count II Defendants as persons doing business in the State of Tennessee by and through First National Bank of Oneida as officers on the board of directors and age herein.

96.     The Count III Defendants have intentionally conspired and agreed to directly and indirectly use or invest income derived from an artifice to rob the equity of the properties mentioned herein, as pattern beginning from the October 1, 1985 Trust Deed by Defendant Allyn M. Lay to which a Loan Officer added $5,000 over the actual amount of the loan "for Tax Purposes", to the January 18, 1998 Trust Deed by Defendant Allyn Lay both of which are used actively to date and incorrectly describe the 214 Hughett Rd aka Granny's House. The loan was added to the principal and subsequently explained as a negative amortization loan or compounded interest. The pattern ripened in series of transaction secured by another fraudulent Trust Deed dated October 22, 1996 and described in an April 21, 2009 Trust Deed Modification as "promise note in the amount of $50,000" a sizeable amount that two bitterly divorced people (Annette and Benton) would clearly remember had they actually received any money from the Loan Officers Jenny Goad and Brenda West. The pattern of 19 subsequent notes listed in the Trustees Deed made every three (3) to pay on the "outstanding debt" until the May 6, 2002 Notes used to name Annette and Benton as borrowers using the $50,000 Trust Deed as collateral and then foreclosing on the properties three (3) months later (August 2002). The Defendants added another $50,000 into the properties and disguised the transaction using only the 225 Hughett Rd. address and $16,000 as 'Cash paid directly to borrowers' in Annette, Benton and Aaron Lawson names added into the principal of

26

both houses. Up until Pamela and Richard came into the picture in April 2009 of which Defendant James Cotton did draft the General Warranty Deed and Title Opinion for the Defendant First National Bank *as attorney of record while he served concurrently on the Board of Directors* and the public office of General Sessions Judge (Honest Services Fraud). Entering Defendant Rhonda Longmire per the bidding of the Board of Directors did offer the Collective Plaintiffs to assume $40,333 if the Plaintiffs would not sue FNB in exchange for a Deed in Lieu of Foreclosure and completely abdicate Pamela and Richard from the debt. The January 2010 act of Ursula Sexton of *the subsidiary First Insured did attempt to fraudulently induce Benton into cancelling his policy to* sell him a more expensive policy. The Defendant Mark Kline attempt to collect the June 2012 insurable casualty from Pamela and Richard for the $40,333 leading to the discovery that the Collective Defendants reneged on the agreement to abdicate the Schilkes from the debt. The discovery of two (2) Trust Deeds in the similar amount of $55,718 and $55,706 made separately *but consecutively to launder $40,333 charge-off. And finally, the April QWR and request for* release of the 35 year-old and 32 year-old trust deeds to be "formally released" if there is no active promise note or recent payment history and for the recent discovery of the incorrect property description as recorded in a Quitclaim Deed and Affidavit of Heirship in November/December 2019.

97.     The Count III defendants conspired to cover up the pattern using the trust deeds to hold the Collective Plaintiffs responsible for the misappropriation of funds by the employees of the FNB rather than investigating their own fraudulent behavior which negatively affects the proceeds from Credit Insurance in the event of default(s) on the loans, any insurable casualty, tax write-offs and proceeds from the short sale of the properties.

98.     The Defendant FNB has unjustly profited from the fraudulent behavior of the Count I, II, and III defendants collecting and untold amount of interest and fees over the 35 years. *Defendants reported the fraudulent amounts to the Credit Bureaus as legitimate debt in an effort* to disguise the nature of transaction from the OCC Bank Examiners. "Anyone who agrees or conspires to pursue the same criminal objective can be held liable for a RICO violation." *Salinas v. United States,* 522 U.S. 52, 63 (1997). "If conspirators have a plan that calls for some…to perpetrate… and others to provide support, the supporters are as guilty as the perpetrators." *Id.* At 64.

99.     The Count III Defendants failure to file a 1099-C with the IRS regarding the charge-off debt shows their attempt to fraudulently conceal the allegations herein.

## COUNT IV

### Intentional Infliction of Emotional Distress

97.     Paragraph 1 through 96 are re-alleged and incorporated by reference herein.

98.     The Collective Defendants conduct as alleged in Counts I through III show a willful intent to inflict emotional distress. To establish a claim Plaintiffs must plead and prove three (3) *essential elements: 1) the conduct alleged was intentional or reckless; 2) and so outrageous it is* not tolerated by civilized society; and 3) the conduct resulted in serious mental injury. [para.] *Bain v. Wells,* 936 S.W.2d 618, 622 (Tenn. 1997).

99.     The conduct of the Defendants is clearly intentional and reckless as sophisticated Loan Officers, Certified Public Accounts, and Attorneys should be held to a standard higher than allows for plausible deniability of any responsibility for the allegations herein. *The conduct of the Collective Defendants is so outrageous they somehow convinced the Plaintiffs good attorney,*

28

1  Defendant William Stover to look the other way, shirking the duty of contractual obligation to

2  advise the Plaintiffs and file a timely lawsuit as retained $2,500. The pain and suffering from

3  *having to comb through the Registers Office countless trips by the Plaintiff Richard Schilke can't*

4  even to compare to the total loss of the all earthly belonging in the 2003 house fire by Pamela

5  when FNB took all the insurable casualty proceeds, or the bitter divorce and subsequent medical

6  treatment for the Plaintiff Annette, or the brazen statement by FNB Brenda West to Benton about

7  telling him that his house (225 Hughett Rd) is the one they want, it's the 'money maker [SIC].'

8  100.  Intentional Infliction is a parasitic claim stemming from the tort of outrageous

9  conduct of the collective Defendants as described herein.

10  **PLAINTIFFS THIRD-PARTY COMPLAINT VS.**

11  **DEFENDANT WILLAIM STOVER**

13  **Cause of Action – Breach of Contract**

15  101.  Paragraph 1 through 100 are re-alleged and incorporated by reference herein.

16  102.  Plaintiffs allege that Defendant William Stover offered to represent the Collective

17  Plaintiffs in a lawsuit versus the Collective FNB Defendants accepting a $2,500 retainer in October

18  2009. After contacting Sydney R. Seals, substitute Trustee, Defendant Stover withdrew from

19  conversation with the Plaintiffs, and deny representation, not responding to emails, etc. Finally,

20  after responding to a Board of Responsibility Complaint filed by Richard Schilke against Mr.

21  Stover and he returned the file Fed-Ex on May 14, 2014, without returning the retainer as promised.

23  **Prayer for Damages**

24  WHEREFORE, Plaintiffs respectfully request that this court:

A.      Request the production of the documents for the original promise notes and batch file "ledger" for each transaction necessitating a trust conveyance: 10/1/85 $25,000, 1/18/88 $3,000, 10/26/96 $50,000 or as listed in the March 2019 "QWR".

B.      Request for production the documents for POD record (batch file) for each "payment" towards the "set-off" amount $40,333 and a dictionary clearly detailing the different codes used to internally transfer money with-in FNB to show all Fund Transfers.

C.      Award equitable relief as this Court deems fit, compensatory damages upwards of $575,000 (treble) not including the interest paid for Defendants unjust enrichment from the Artifice described herein.

D.      Award punitive damages for the deceptive business violations of the TCPA in the amount that this Court deems fit to deter future culpable behavior. T.C.A. § 47-18-109(a)(1) creates a private cause of action for any person who suffers a loss as a result of one of the listed "unfair or deceptive acts or practices" found in T.C.A. § 47-18-104(b). T.C.A. § 47-18-109(a)(1) provides as follows:

> *(a)(1) Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, __may bring an action individually to recover actual damages__.*

E.      Award punitive damages… $3,000,000 for pain and suffering for damages i.e. absconding with the insurable casualty for the replacement of contents of the 2003 house fire, fraud for profit, etc.

F.      Award court costs and other reasonable expenses.

1      G.     Assert the partial responsibility to the Defendant WILLIAM STOVER for the

2  grossly negligent and unethical failure to provide the Plaintiffs with adequate counsel to expedite

3  *this claim or in the alternative refund the amount of 7,500 (treble) the amount of the retainer.*

4      H.     Disgorge the Defendant FNB for the unjust enrichment at the expense of the

5  Collective Plaintiffs.

6      I.     The Plaintiffs respectfully reserve the right to amend the complaint.

7      Plaintiffs provide with this filing the two (2) Special Power of Attorney, Quitclaim Deed

8  and Affidavit of Heirship recorded November 2019.

9      By the signatures below the Plaintiffs according to Rule 11 of the FRCP solemnly swear

10  that this action is in not account fraudulent or unnecessary. Respectfully Submitted this 30th day

11  December 2019.

12                              Richard Schilke, *Plaintiff Pro Se*

13                              Pamela Schilke, *Plaintiff Pro Se*

14                              128 Lawson Rd.

15                              Huntsville, TN 37756

16                              (423) 627-7796

17

18